# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

ROYAL POTCAKE RESCUE,
and POTCAKE RESCUE, LLC,

       Plaintiffs,

v.                                                                  Case No.: 8:24-cv-1909-LSG

CENTERS FOR DISEASE CONTROL
& PREVENTION; MANDY COHEN,
Director of the Centers for Disease
Control & Prevention; DEPARTMENT
OF HEALTH AND HUMAN
SERVICES,

       Defendants.

_____/

## ORDER

The plaintiffs sue under the Administrative Procedure Act, 5 U.S.C. § 701, et

seq., for review of a May 13, 2024, final rule governing the import of dogs into the

United States issued by the Centers for Disease Control and Prevention, which is

part of the United States Department of Health and Human Services. Doc. 1. The

plaintiffs move for summary judgment, and the defendants file a cross-motion for

summary judgment. Docs. 45, 61–62. After carefully reviewing the briefs and the

administrative record, and with the benefit of oral argument, I deny the plaintiffs'

motion, Doc. 45, and grant the defendants' motion because the regulation is within

the CDC's statutory authority and is not arbitrary and capricious as applied to the Caribbean Islands.

## I.    BACKGROUND

Rabies is a viral disease that attacks a host's central nervous system. Doc. 44-5 at 435. Rabies spreads through a bite or a scratch by an infected animal. Doc. 60, ¶ 8. A rabies infection is nearly always fatal in both humans and animals after clinical signs appear. *Id.* In the United States, rabies infects wild animals, such as bats, raccoons, skunks, and foxes. *Id.* In many other countries, dogs carry rabies, and most deaths from rabies in humans occur after a dog bite. *Id.*

This case challenges a CDC foreign quarantine regulation aimed at preventing the spread of rabies through imported domestic dogs. The history of those regulations, which first emerged shortly after Congress passed the Public Health Service Act in 1944,[1] provides a helpful starting point.

### A. A brief history of CDC's dog import regulations and dog admissions.

In 1956, the Public Health Service finalized regulations governing the import of domestic dogs. 21 Fed. Reg. 9879 (Dec. 12, 1956). For a dog brought into a U.S. port from "any foreign country other than Bermuda, Denmark, [Ireland], Norway, Sweden, or the United Kingdom of Great Britain and Northern Ireland," the regulations required both a physical inspection and a rabies immunization. *Id.* An owner could satisfy the inspection requirement either (1) by submitting a sworn

---

[1] Public Health Service Act, Pub. L. No. 410, 58 Stat. 682 (1944).

statement that the animal "was physically inspected within ten days prior to departure for the United States and was found apparently free of demonstrable diseases involving emaciation, lesions of the skin, nervous system disturbances, jaundice, or diarrhea" or (2) by participating in an examination at a U.S. Port by a quarantine officer, who found the animal "apparently free from any demonstrable diseases" involving any of the same symptoms. *Id.* An owner could satisfy the vaccination requirement (1) by submitting "a sworn statement that the animal has been immunized with an approved rabies vaccine not more than six months prior to the date of entry," (2) by vaccinating the animal "with an approved rabies vaccine following arrival . . . and prior to release from quarantine," or (3) by submitting a sworn statement that the animal is destined for a research institution and that "immunization will seriously interfere with its use for such purposes." *Id.* The 1956 regulations conclude that "[a] . . . dog . . . excluded from entry under the regulations in this part shall be destroyed or deported." *Id.*

An update to these regulations occurred in 1985. Doc. 60, ¶ 10; 50 Fed. Reg. 1516 (Jan. 11, 1985). Like the 1956 regulations, the updated regulations required an inspection of all dogs arriving at a U.S. port. 50 Fed. Reg. at 1522. The regulations permitted the CDC to admit "only those dogs . . . which show no signs of communicable disease." *Id.* If an inspection revealed symptoms of disease, such as "emaciation, lesions of the skin, nervous system disturbances, jaundice, or diarrhea," the CDC could require "prompt confinement" pending a "determination of [the dog's] admissibility" and a veterinary examination. *Id.* The regulations also

3

contained a rabies vaccination requirement mandating "[a] valid rabies vaccination certificate" unless the owner demonstrated that,

> (i) If a dog is less than 6 months of age, it has been only in a country determined by the Director to be rabies-free (a current list of rabies-free countries may be obtained from the Division of Quarantine, Center for Prevention Services, Centers for Disease Control, Atlanta, Georgia 30333); or
>
> (ii) If a dog is 6 months of age or older, for the 6 months before arrival, it has been only in a country determined by the Director to be rabies-free; or
>
> (iii) The dog is to be taken to a research facility to be used for research purposes and vaccination would interfere with its use for such purposes.

*Id.* A "valid rabies vaccination certificate" is, among other things, one "issued for a dog not less than 3 months of age" and signed by a licensed veterinarian. *Id.*

Outside of these circumstances, the CDC could admit a dog "less than three months of age" but must confine the dog "until vaccinated against rabies at 3 months of age and for at least 30 days after the date of vaccination." *Id.* A dog admitted under this section triggered a requirement to notify to the health department in the destination jurisdiction "to facilitate surveillance and other appropriate action." *Id.* Similar to the 1956 regulations, the 1985 regulations provided that "[a] dog . . . excluded from the United States under the regulations in this part shall be exported or destroyed." *Id.*

In 2007, the CDC declared the United States "rabies-free." 89 Fed. Reg. 41726 (May 13, 2024). The CDC designates a country as "rabies-free" based on international standards for the absence of dog-maintained rabies, the adequacy of

4

surveillance, and the efficacy of dog vaccination programs. Doc. 60, ¶¶ 4–6, 11. The
CDC estimates that approximately one million dogs are imported into the United
States each year and that 100,000 of those come from "high risk" countries. Doc. 60,
¶ 12. The CDC designates a country as high risk based on "the presence and
geographic distribution of the virus or low quality of or low confidence in the
country's rabies surveillance systems or dog vaccination programs." Doc. 60, ¶ 6. A
"low risk" country is not rabies-free, but the virus is "in a controlled status" with the
country progressing toward rabies-free status. Doc. 60, ¶ 5.

Between 2015 and 2021, four rabid dogs entered the United States. Doc. 60,
¶¶ 14–15. In each case, the dog arrived with an animal rescue group importing dogs
for pet adoption. *Id.* Three of the dogs came from Egypt, which is a high-risk
country, and arrived with confirmed or suspected false vaccination documents. *Id.*
The fourth arrived from Azerbaijan with apparently valid vaccination documents. *Id.*
As a result of the four dogs' importation, dozens of people required post-exposure
prophylaxis and dozens of dogs required a lengthy quarantine. *Id.* One of the rabid
dogs traveled with a group of animals from Egypt to the United States through the
Canadian border. *Id.* Despite arriving with a vaccination certificate and an adequate
rabies antibody titer,[2] the dog tested positive for rabies three weeks after arrival and
placement in a home. *Id.* Because the CDC suspected that the vaccination
documents and test results were false, forty-four individuals received post-exposure

---

[2] A titer is a test that determines the level of antibodies in the blood. Doc. 60, ¶ 15.c.

prophylaxis, and twenty-five dogs were re-vaccinated and required to quarantine. Doc. 60, ¶ 15.c.

In 2019, the CDC temporarily suspended the import of dogs from Egypt. Doc. 60, ¶ 19. In 2020, the CDC observed a fifty-two percent increase in the number of dogs excluded from importation because of falsified or fraudulent documentation. Doc. 60, ¶ 18. In 2021, the CDC temporarily suspended the import of dogs from all high-risk countries. Doc. 60, ¶ 19.

**B. CDC's new dog import regulations.**

In 2023, the CDC issued a notice of proposed rulemaking to revise the dog import regulations to prevent "the reintroduction and spread of [dog] rabies virus variant[] in the United States" and "the importation of dogs with falsified or fraudulent rabies vaccine documentation." Doc. 60, ¶ 20. The CDC finalized new regulations on May 13, 2024. Doc. 60, ¶ 21; 89 Fed. Reg. at 41726. Contemporaneously, the CDC announced that the import ban for dogs from high-risk countries would expire on July 31, 2024. 89 Fed. Reg. at 41738.

To import a dog under the CDC's new regulations, the dog must be at least six months old and have a microchip implanted on or before the day of the dog's current rabies vaccine. 42 C.F.R. § 71.51(f)–(g), (v)(xiii). The importer must (1) submit a CDC dog import form that describes the countries in which the dog has been physically present within the previous six months and (2) consent upon arrival at a U.S. port to an inspection of the animal for signs of communicable disease. 42 C.F.R. § 71.51(a), (i). An importer who refuses to consent to inspection "shall have

6

the animal denied admission and returned to its country of departure[.]" 42 C.F.R. § 71.51(i)(4), (v).

For dogs older than six months, the regulations distinguish between a dog arriving from a high-risk country and a dog arriving from a low-risk or rabies-free country. For example, a dog arriving from a high-risk country may enter only through an airport with a quarantine station and a CDC-registered animal care facility. 42 C.F.R. § 71.51(b)(4). A dog from a low-risk or rabies-free country with documentation of having been only in such countries for the last six months may arrive through any airport, land port, or seaport. 42 C.F.R. § 71.51(b)(2), (c)(2), (d)(2). A dog from a high-risk country must arrive with a CDC vaccination certificate, while a dog from a low-risk or rabies-free country may arrive with written documentation showing that the dog has been only in a low-risk or rabies-free country for the six months before arrival to the United States. 42 C.F.R. § 71.51(s), (u). A dog from a rabies-free country need not provide proof of rabies vaccination. 42 C.F.R. § 71.51(u)(1).

### C. The allegations and procedural posture of this case.

The plaintiffs in this case are Royal Potcake Rescue, a 501(c)(3) corporation, and Potcake Rescue, LLC, a Florida limited liability company, both of which are headquartered in Florida. Doc. 1, ¶ 12. The organizations help rescue, foster, and facilitate adoption of "Potcakes," which are dogs born on the streets of the Caribbean Islands. *Id.* The plaintiffs allege that the CDC's new dog import regulations constitute an "import ban" on dogs younger than six months. Doc. 1, ¶ 1. According

7

to the plaintiffs, this "import ban" exceeds the CDC's statutory authority "because an import ban is not a measure authorized under [42 U.S.C. §] 264(a) and because the import ban is not supported by the predicate findings required under [42 U.S.C. §] 265." Doc. 1, ¶ 69. The plaintiff further alleges that the "import ban" is arbitrary, capricious, and an abuse of discretion as to the Caribbean Islands because "it is not and cannot rationally be supported by any evidence, is contrary to the evidence that the CDC acknowledged in its rulemaking, and is the product of factors that the CDC lacked the authority to consider." Doc. 1, ¶ 70.

The plaintiffs move for summary judgment on these claims. Docs. 45, 63. The CDC responds in opposition and files a cross-motion for summary judgment. Docs. 61, 62, 64. The parties consented to my jurisdiction, Docs. 52–53, and I held oral argument on August 27, 2025. The CDC filed supplemental citations to the record on September 10, 2025, and the plaintiff responded. Docs. 69, 70.

## II.  JURISDICTION

Although neither party contests jurisdiction, I have an independent obligation to examine whether the plaintiffs satisfy the jurisdictional prerequisite of standing. *Bischoff v. Osceola Cnty., Fla.*, 222 F.3d 874, 877-78 (11th Cir. 2000). To establish standing under Article III of the U.S. Constitution, the plaintiffs must show an injury in fact traceable to the defendant's action and redressable by a favorable judicial decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); *State v. Becerra*, 544 F. Supp. 3d 1241, 1251 (M.D. Fla. 2021) ("Article III of the United States Constitution

limits the jurisdiction of a federal court to an actual, perceptible, and existing case or controversy.") An injury in fact requires "'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560); *Sierra Club v. Morton*, 405 U.S. 727, 734–35 (1972); *see also Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017) ("For standing purposes, a loss of even a small amount of money is ordinarily an 'injury.'").

Here, the plaintiffs establish that they suffered an injury in fact. The plaintiffs claim that the new dog import rule caused a "devastating financial impact" on their business. Doc. 45 at 5 (citing Doc. 18-2, ¶ 11). The plaintiffs allege that compliance with the rule's six-month age requirement has caused longer and costlier foster periods for rescue dogs; narrower windows during which rescued dogs can travel to the United States; reductions in adoptions and donor funds; and reductions in resources available for rescuing dogs. Doc. 46, ¶ 75. Thus, the plaintiffs demonstrate an actual, concrete, and particularized injury. *See Czyzewski*, 580 U.S. at 464.

The plaintiffs' injury is "fairly traceable" to the CDC's action. The plaintiffs argue that the CDC's rule is the sole cause of their injury. Compliance with the six-month age requirement has increased adoption times and costs while reducing donations. Doc. 46, ¶ 75 (citing Doc. 18-2, ¶ 11). Enjoining or invalidating the CDC's rule would allow the plaintiffs to avoid the financial impact of the six-month age requirement, Doc. 18-2, ¶¶ 7–10, and resume placing four-month-old dogs in

9

American "forever homes." Doc. 18-2, ¶ 5. Accordingly, the plaintiffs establish Article III standing. *See Lujan*, 504 U.S. at 560–61.

Standing further requires that a plaintiff "sue to vindicate an interest 'protected or regulated by the statute or constitutional guarantee in question.'" *Becerra*, 544 F. at 1251. If the plaintiff's interest is among those protected by the statute, the plaintiff establishes prudential standing. *Nat'l Credit Union Admin. Co.*, 522 U.S. at 492. "[B]ecause Congress has enacted the APA to enable judicial review of agency action, establishing statutory standing for an APA claim is not 'especially demanding.'" *Becerra*, 544 F. Supp. 3d at 1257 (quoting *Lexmark*, 572 U.S. at 130).

Here, the plaintiffs facilitate the import of dogs into the United States. Doc. 18-2, ¶¶ 7–11. Thus, their economic interest falls within the zone of interests regulated by the CDC's dog import regulations. Therefore, the plaintiffs have statutory standing.

## III.    STANDARD OF REVIEW

"Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 117 (2022). "Congress in 1946 enacted the APA 'as a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices.'" *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391 (2024) (quoting *United States v. Morton Salt Co.*, 338 U.S. 632, 644 (1950)). Thus, the APA creates a statutory right to

judicial review of an agency action for "[a] person suffering legal wrong because of agency action[] or adversely affected or aggrieved by agency action within the meaning of a relevant statute[.]" 5 U.S.C. § 702. The APA requires that, "[t]o the extent necessary to decision and when presented," a reviewing court must "decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Section 706(2) further requires that the reviewing court hold unlawful and vacate an agency action (1) that exceeds an agency's statutory authority or (2) that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A), (C).

"Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright*, 603 U.S. at 412. Furthermore, an agency action must be "reasonable and reasonably explained." *Bidi Vapor LLC v. U.S. Food & Drug Admin.*, 134 F.4th 1282, 1286 (11th Cir. 2025). The "arbitrary and capricious" standard requires that the agency "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

Rule 56, Federal Rules of Civil Procedure, permits judgment as a matter of law in the absence of a disputed, material fact. "'The summary judgment procedure is particularly appropriate in cases in which the court is asked to review . . . a decision of a federal administrative agency.'" *Fla. Fruit & Vegetable Ass'n v. Brock*, 771

11

F.2d 1455, 1459 (11th Cir. 1985) (quoting 10A *Wright & Miller's Federal Practice and Procedure* § 2733 (2d. ed. 1983)). "The focal point for judicial review of an administrative agency's action should be the administrative record." *Pres. Endangered Areas of Cobb's Hist., Inc. v. U.S. Army Corps of Eng'rs*, 87 F.3d 1242, 1246 (11th Cir. 1996) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)); *Sierra Club v. U.S. Army Corps of Eng'rs*, 295 F.3d 1209, 1216 (11th Cir. 2002) (explaining that review under the APA "requires the court to consider not only the final documents prepared by the agency, but also the entire administrative record."). "The reviewing court is not generally empowered to conduct a *de novo* inquiry into the matter being reviewed and to reach its own conclusions based on such an inquiry." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). Rather, if the record "does not support the agency action," if the agency "has not considered all relevant factors," or if the reviewing court "simply cannot evaluate the challenged agency action on the basis of the record," then "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation." *Id.* at 744; *Cobb's Hist., Inc.*, 87 F.3d at 1246.

## IV.    ANALYSIS

### A. The CDC is authorized "to make and enforce" regulations providing for the inspection of animals to prevent the spread of communicable disease.

"Amid disquiet about the spread of malaria, Congress in 1944 passed the Public Health Service Act, the statute central to this action." *Becerra*, 544 F. Supp. 3d at 1262 (describing the history of CDC's quarantine power). The Public Health Service Act "largely organized, consolidated, and clarified the federal government's

12

existing legal authority," which included inspecting arriving vessels and passengers at

United States ports of entry for communicable disease and temporarily forbidding

entry or import of particular items. *Id.* at 1259, 1261–64 (describing the statute as

codifying "the limited regulatory power typical of preventing diseases caused by a

discrete item or person at a major port of entry."); 42 U.S.C. Ch. 6A, Subch. II, Pt.

G. Section 264(a) of Title 42, United States Code, authorizes the Surgeon General

> to make and enforce such regulations as in his judgment are necessary
> to prevent the introduction, transmission, or spread of communicable
> diseases from foreign countries into the States or possessions, or from
> one State or possession into any other State or possession. For purposes
> of carrying out and enforcing such regulations, the Surgeon General
> may provide for such inspection, fumigation, disinfection, sanitation,
> pest extermination, destruction of animals or articles found to be so
> infected or contaminated as to be sources of dangerous infection to
> human beings, and other measures, as in his judgment may be
> necessary.

*See* 42 C.F.R. § 70.2 (delegating this authority to the CDC); *Health Freedom Def. Fund,*

*Inc. v. Biden*, 599 F. Supp. 3d 1144, 1156 (M.D. Fla. 2022); *Becerra*, 544 F. Supp. 3d

at 1264 n.28. The first sentence of Section 264(a) grants the CDC "broad authority to

implement regulations" that, in CDC's judgment, are necessary to prevent the spread

of communicable disease. *Becerra*, 544 F. Supp. 3d at 1268. The second sentence

"informs the grant of authority by illustrating the kinds of measures that could be

necessary: inspection, fumigation, disinfection, sanitation, pest extermination, and

destruction of contaminated animals and articles." *Alabama Ass'n of Realtors v. Dep't of*

*Health & Hum. Servs.*, 594 U.S. 758, 763 (2021); *Becerra*, 544 F. Supp. 3d at 1268

("The second sentence of Section 264(a) discloses, illustrates, exemplifies, and limits

13

to measures similar in scope and character the measures contemplated and authorized by Congress when enacting the statute."). "These measures directly relate to preventing the interstate spread of disease by identifying, isolating, and destroying the disease itself." *Ala. Ass'n*, 594 U.S. at 763. "Regulations under this authority have generally been limited to quarantining infected individuals and prohibiting the import or sale of animals known to transmit disease." *Id.* at 761.

Accordingly, if Section 264 authorizes an import ban for dogs younger than six months, "the enforcement measures must resemble or remain akin to 'inspection, fumigation, disinfection, sanitation, pest extermination, [or the] destruction of infected animals or articles.'" *Becerra*, 544 F. Supp. 3d at 1268. The CDC argues that the age requirement is an inspection measure. Doc. 62 at 14. Specifically, the CDC argues that the requirement allows an inspector to more readily (1) determine a dog's age through inspection of the dog's teeth; (2) evaluate a dog's lack of coordination, which is an apparent symptom of rabies but also a feature of young puppies; and (3) ensure accurate test results on a serologic titer, which is unreliable until six months of age. *Id.* The plaintiffs argue that CDC's age requirement is not an inspection measure because no inspection occurs, but rather the CDC dispenses entirely with the task of identifying, isolating, and destroying disease. Doc. 45 at 14-15. If the age requirement is an inspection measure, the plaintiffs contend that the CDC could effectively label any import ban an inspection requirement and avoid the requirements of 42 U.S.C. § 265. Doc. 63 at 4-5. Thus, the parties' dispute over the CDC's age requirement presents a controlling question of statutory interpretation.

### B. The CDC's ban on dogs younger than six months falls with the CDC's inspection power.

   *i. The CDC's inspection power under Section 264(a) includes the power to establish conditions for inspection and to exclude animals that fail inspection or that are not susceptible to inspection.*

Section 264(a) authorizes the CDC to "make and enforce" regulations necessary to prevent "the introduction, transmission, or spread of communicable disease" from foreign countries. Those regulations may provide for an inspection, or "other measures" similar to an inspection, "as in [the CDC's] judgment may be necessary." The question here is whether the CDC can categorically exclude dogs younger than six months old from entering the United States through the CDC's inspection authority in Section 264(a). As the plaintiffs correctly argue, an inspection is a close and critical examination. By prohibiting the youngest dogs altogether, the CDC dispenses entirely with the inspection. Although seemingly problematic, this may fall within the CDC's inspection authority. If the CDC cannot adequately inspect a dog under six months for rabies or rabies immunity, imposing an age requirement to facilitate a rabies inspection falls within the inspection power in Section 264(a).

The interpretation of a statute must begin with its language. *Republic of Sudan v. Harrison*, 587 U.S. 1, 8 (2019). As explained above, Section 264(a) emerged as part of the Public Health Service Act of 1944 and, through delegation by the Surgeon General, grants the CDC authority to "make and enforce" regulations governing the inspection of items arriving at U.S. ports from foreign countries. The statute nowhere

defines the term "inspection," which means that "inspection" conveys its ordinary meaning. *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 85 (2018); *Consol. Bank, N.A., Hialeah, Fla. v. U.S. Dep't of Treasury, Off. of Comptroller of Currency*, 118 F.3d 1461, 1464 (11th Cir. 1997) ("In the absence of a statutory definition of a term, we look to the common usage of words for their meaning."). A dictionary definition contemporaneous with the statute's enactment aids in determining ordinary meaning. *See id.* One such definition describes "inspect" as "to view closely and critically, esp. so as to ascertain quality or state, to detect errors, etc." *Webster's New Int'l Dictionary* 1286 (William Allan Neilson, et al. eds., 2d ed. 1942). "Inspection" means "a strict or prying examination" and, in the legal sense, "[t]he examination of articles of commerce (under laws called inspection laws) to determine their fitness for transportation or sale." *Id.*; *Black's Law Dictionary* 984 (3d ed. 1933) ("'Inspection' means more than perusal, and means a critical examination, close or careful scrutiny, a strict or prying examination, or an investigation."). An example is the "examination or testing of food, fluids, or other articles made subject by law to such examination, to ascertain their fitness for use or commerce." *Black's*, *supra*, at 984; *Acosta v. Loc. Union 26, UNITE HERE*, 895 F.3d 141, 143–44 (1st Cir. 2018).

The authority to inspect includes those acts necessary to accomplishing the inspection because authorization for an act "implicitly authorizes whatever is a necessary predicate of that act." Antonin Scalia & Bryan Garner, *Reading Law: The Interpretation of Legal Texts*, 96, 192–93 (2012) ("'[W]henever a power is given by a statute, everything necessary to making it effectual or requisite to attaining the end is

implied.").[3] For example, the authority to inspect an animal arriving from a foreign country necessarily includes setting conditions for the inspection, such as viewing, touching, and testing of the animal and confirming the provenance of the animal. *See, e.g., Friends of Boundary Waters Wilderness v. Bosworth*, 437 F.3d 815, 823 (8th Cir. 2006) ("Agencies given the authority to promulgate a quota are presumed to have the authority to adjust that quota."); *Sullivan v. Lincoln Cnty. Water Dist.*, 542 P.3d 411, 424 (Nev. 2024) (statutes requiring state engineer to determine the amount of water in a proposed source of supply include implied authority to determine the boundaries of the water source); *Vickers v. Lowe*, 247 P.3d 666, 670 (Idaho 2011) ("The power to determine when and how a developer may build an encroachment is implied from the ITD's authority to regulate the design of public highways."). Thus, the power to inspect includes the power to establish the means and manner of the inspection.

"[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809 (1989). Section 264(a) falls within the CDC's "quarantine and inspection" powers, 42 U.S.C. §§ 264–272, and authorizes regulations "necessary to prevent the introduction" of communicable disease. This

---

[3] "'The implication under this rule . . . must be a necessary, not a conjectural or argumentative one,'" and if "'the means for the exercise of a grant of power are given, no other or different means can be implied, as being more effectual or convenient.'" A. Scalia & B. Garner, *supra*, at 193 (quoting *Field v. People ex rel. McClernand*, 3 Ill. 79, 83 (1839) to explain that this cannon "must be applied with caution, lest the tail of what is implied wag the dog of what is expressly conferred.").

language conveys the power to exclude from entry an animal if necessary to prevent the introduction of a disease into the United States. Similarly, Section 265 authorizes a categorical prohibition of "persons or property" from a particular foreign country if, "by reason of the existence of any communicable disease" in that country, a "serious danger of the introduction of such disease into the United States" exists. 42 U.S.C. § 265 (explaining that the President of the United States must approve such regulations). In other words, Section 265 authorizes a categorical ban on dogs from Egypt, for example, based on a serious danger that a dog from that country would introduce rabies. Section 264(a), on the other hand, permits exclusion deriving from one of Section 264(a)'s enumerated powers, such as the power to inspect.

The history of the CDC's quarantine power further supports an interpretation of Section 264(a) that grants the CDC broad authority to establish inspection conditions necessary to protect the public health and to exclude animals or articles failing those conditions. The Public Health Service Act codified the federal government's existing quarantine power, which at the time involved inspecting vessels, passengers, and items at United States ports of entry and temporarily forbidding entry or import of a person or item posing a risk of spreading communicable disease. *Becerra*, 544 F. Supp. 3d at 1258–64. Establishing conditions for entry and excluding an animal as necessary to prevent the spread of communicable disease falls squarely within the federal government's quarantine power as it existed at the time of the Public Health Service Act. *See id*.

Furthermore, "interpretations issued contemporaneously with the statute at

issue, and which have remained consistent over time, may be especially useful in determining the statute's meaning." *Loper Bright*, 603 U.S. at 394; *Bondi v. VanDerStok*, 145 S.Ct. 857, 874 (2025). Both the 1956 regulations, which occurred a decade after the statute's passage, and subsequent interpretations of Section 264(a) show that the CDC's exclusion can be categorical. *See Bruno Project Rescue, Inc. v. Dep't of Health & Human Servs.*, No. 24-cv-11552-DJC, 2025 WL 1712912, *5 (D. Mass. June 18, 2025); *State of La. v. Mathews*, 427 F. Supp. 174, 176 (E.D. La. 1977) (upholding a small turtle ban under Section 264(a) and explaining that "the law does not require the adoption of an onerous testing scheme under which every turtle, or lot of turtles, is to be tested every week so as to find that percent which becomes reinfected. Such a testing alternative is patently unreasonable, and a total ban is permissible as necessary to prevent the spread of communicable disease."); 21 Fed. Reg. 9870, 9878 (Dec. 12, 1956) ("Psittacine birds shall not be brought into the United States for the purpose of sale or trade"); 21 Fed. Reg. at 9879 ("A person shall not import into any place under the control of the United States . . . any etiological agent or insect, animal or plant vector of human disease or any exotic living insect, animal or plant capable of being a vector of human disease unless accompanied by a permit issued by the Surgeon General"); 21 Fed. Reg. at 9879 ("The remains of a person dead from a quarantinable disease shall not be brought into a port . . . unless it is (a) properly embalmed and placed in a hermetically sealed casket, or (b) cremated.").

An interpretation of Section 264(a) that permits a categorical exclusion based

on the CDC's inspection power does not, as the plaintiffs argue, violate the canon against surplusage. Doc. 45 at 16. Sections 264(a) and 265 serve different purposes. As explained above, an exclusion under Section 264(a) must derive from an inspection, a measure similar to an inspection, or another enumerated power. For example, since 1956, the CDC's dog import regulations have prohibited the import of a dog whose owner refuses to submit the dog for an inspection or examination. 12 Fed. Reg. at 9879, 42 C.F.R. § 71.154(a)-(b);[4] 50 Fed. Reg. at 1522, 42 C.F.R. § 71.51(b); 42 C.F.R. § 71.51(i)(4) (an importer who refuses "to consent to inspection, examination, disease surveillance screening, or diagnostic testing of the animal upon arrival shall have the animal denied admission and returned to its country of departure[.]"). The CDC imposes an inspection as a condition of entry, and the CDC categorically excludes a dog whose owner refuses to consent to an inspection. If a dog is not susceptible to inspection for some other reason, that too may support a categorical exclusion. *See Mathews*, 427 F. Supp. at 175–76 (explaining that studies about the re-contamination of organism-free small turtles supported a total ban).

The CDC's authority under Section 265 is different. Section 265 authorizes the "suspension of entries and imports from designated places," that is, a foreign country with a communicable disease, based on a serious danger that such entries will introduce that disease. A suspension may extend "for such period of time as [the

---

[4] The 1956 regulations excepted from this requirement dogs from certain countries, including Bermuda, Denmark, Ireland, Norway, Sweden, and the United Kingdom.

CDC] may deem necessary for such purpose." Thus, a suspension under Section 265

(1) must derive from a country-specific finding and have a country-specific target,

(2) may endure for a period deemed "necessary" to avert a serious danger, and (3) is

untethered to the quarantine and inspection powers specified in Section 264(a). By

contrast, Section 264(a) limits the CDC's power to measures falling within its

specific language and necessary to prevent the introduction of communicable

disease. The CDC could not, as the plaintiffs argue, deem any age an inspection

measure under Section 264(a), because the CDC would have to tie that age to the

CDC's ability to inspect (fumigate, disinfect, sanitize, etc.) and prevent the

introduction of communicable disease. Doc. 45 at 16.

Accordingly, the text and context of Section 264(a) demonstrate (1) that the

power to inspect includes the power to establish conditions for inspection and to

exclude from entry an animal that either fails inspection or is not susceptible to

inspection and (2) that the exclusion may be categorical as long as the exclusion

derives from a power delineated in Section 264(a).

*ii. Is a dog under six months old susceptible to inspection for rabies?*

As explained above, the CDC distinguishes between high-risk, low-risk, and

rabies-free countries and adopts different import requirements based on those

classifications. As to the age requirement, however, the CDC imposes that import

restriction on all countries

> [t]o address concerns about importations of puppies that are too young
> to be properly vaccinated against rabies . . . . Dogs cannot be vaccinated
> effectively against rabies before 12 weeks of age and are not considered

21

> fully vaccinated until 28 days after vaccination. Establishing a six-month age requirement for the import of dogs . . . will better protect the public's health from rabies.

89 Fed. Reg. at 41727. The CDC explains further that requiring dogs from rabies-free or low-risk countries to be at least six months old "prevent[s] importers from trying to circumvent CDC's requirements by moving dogs from [rabies] high-risk countries through [rabies]-free or [rabies] low-risk countries." *Id.* at 41765. The next section of this order will discuss whether extending the age requirement to the rabies-free Caribbean Islands is arbitrary and capricious as applied to those countries. For the purpose of determining whether a six-month age requirement is within the scope of the CDC's statutory authority in Section 264(a), this section considers solely whether a dog's age impacts the CDC's ability to inspect for rabies.

According to the CDC, "[s]creening for rabies can be difficult in puppies because they can often exhibit dyskinetic or uncoordinated movement as part of their normal growth and development." *Id.* at 41766; Doc. 44-6 at 1. "These awkward movements can also be seen in rabid dogs and may be mistaken in young puppies for normal movement patterns." 89 Fed. Reg. at 41766. The incubation period for rabies in dogs is "typically [four to eight] weeks after infection . . . but can be as long as [six] months." Doc. 60, ¶ 17. According to scientific literature in the record, a dog cannot be vaccinated effectively for rabies until twelve weeks old. Doc. 44-5 at 108–19; 89 Fed. Reg. at 41727, 41765–66. A dog is not considered fully vaccinated until twenty-eight days after initial vaccination, when "a peak rabies virus antibody titer is

expected." Doc. 44-5 at 111. In other words, a dog is not considered fully vaccinated until approximately four months of age.

The "World Organization for Animal Health" (WOAH) recommends waiting an additional three months after the titer results for the absence of clinical signs of rabies.[5] 89 Fed. Reg. at 41759-60, 41765-66; Doc. 44-5 at 434; Doc. 44-6 at 347. This additional waiting period mitigates the risk of importing a dog infected with rabies before vaccination by permitting a period of observation for clinical signs of the disease. *Id.* The CDC concluded that waiting thirty days between titer collection and travel "is sufficient for monitoring the dog to ensure it does not develop signs of rabies." 89 Fed. Reg. at 41765. The CDC relied on scientific literature suggesting that the WOAH's three-month waiting period for a dog from a high-risk country is "not supported by current evidence" and is "unnecessarily restrictive." Doc. 44-5 at 434-35; 89 Fed. Reg. at 41760. Rather, a thirty-day waiting period after the titer result "is more than sufficient to mitigate" the rabies risk. Doc. 44-5 at 435; 89 Fed. Reg. at 41765. An analysis of historical data shows that a dog "with detectable rabies virus serum antibody will either succumb to rabies within two weeks or will remain healthy[.]" Doc. 44-5 at 437. Accordingly, "[a] 30-day waiting period represents over a two-fold increase in the maximum time necessary to properly assess dogs and

---

[5] This is the requirement for a high-risk country, because the WOAH standards distinguish between high risk and rabies-free countries. For a dog from a rabies-free country, WOAH recommends requiring an international veterinary certificate attesting (1) that the animal showed no clinical signs of rabies the day before or on the day of shipment and (2) that the animal was either kept "since birth or at least six months prior to shipment in a [rabies]-free country or zone" or was imported in accord with the requirements for animals from high-risk countries. Doc. 44-6 at 347-48.

prevent importation when considering [the] risk [of a pre-vaccination infection]."
Doc. 44-5 at 435.

Thus, in terms of rabies immunity, the record shows that a dog is susceptible to inspection for rabies or rabies immunity at five months old. Given the importance of age to confirming a dog's rabies immunity, the CDC requires some method to verify the dog's age. The CDC explains and the record contains evidence showing that veterinarians rely on dental patterns. Doc. 62 at 8; 89 Fed. Reg. at 41765-66; Doc. 44-4 at 144–54; Doc. 44-5 at 205; Doc. 44-6 at 1, 34–38. A dental analysis of a dog's teeth is most reliable six months after birth when a dog has lost all of its puppy teeth. *Id.* Accordingly, the record demonstrates that, to reliably assess a dog of unknown provenance for rabies, that dog must be at least five months old and that, to reliably determine a dog's age, that dog must be at least six months old.

Based on the evidence in the administrative record, the CDC's six-month age requirement appears "directly related" to "identifying, isolating, and destroying" rabies, *Ala. Ass'n*, 594 U.S. at 763, and within the CDC's authority under Section 264(a).

### C. The six-month age requirement is not arbitrary and capricious as applied to the rabies-free Caribbean Islands.

#### i. The standard of review is deferential and narrow.

The APA's "arbitrary and capricious" standard is deferential and narrow, which means that a court cannot substitute its judgment for that of the agency. *Gray Television, Inc. v. Fed. Commc'ns Comm'n*, 130 F.4th 1201, 1212 (11th Cir. 2025). The

standard requires an agency to articulate a "satisfactory explanation for its action," including a "'rational connection between the facts found and the choices made.'" *State Farm*, 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)); *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221, (2016) (explaining that an agency satisfies the standard "when the agency's explanation is clear enough that its 'path may reasonably be discerned.'"). "[T]he agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington*, 371 U.S. at 168.

An agency may change an existing policy as long as the agency provides "a reasoned explanation for the change." *Navarro*, 579 U.S. at 221. In other words, the agency must at least "'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Id.* (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Fox Television*, 556 U.S. at 515.

Here, the plaintiffs argue that the six-month age requirement, as applied to the "rabies-free Caribbean Islands,"[6] is arbitrary and capricious because the record

---

[6] The plaintiffs describe the rabies-free Caribbean Islands as Anguilla, Antigua, Aruba, Bahamas, Barbados, Barbuda, Cayman Islands, Dominica, Guadeloupe (including St. Bart and St. Martin), Jamaica, Martinique, St. Kitts and Nevis, St. Lucia, St. Vincent and the Grenadines, Turks and Caicos, Trinidad and Tobago, and the Virgin Islands (U.S. and U.K.). Doc. 45 at 6 n.6; *see* CDC's Rabies Status by Country, available at https://www.cdc.gov/rabies/country-data/index.html (last visited Sept. 2, 2025).

25

contains no rational justification for this requirement as a rabies prevention measure for those countries. Docs. 45, 63. The CDC responds that the age requirement is not overly broad but "rationally related to CDC's goal of reducing fraud by ensuring reliable inspections" and is based on both "scientific and historical evidence" and a careful consideration of the potential impact on dog import organizations like the plaintiffs. Doc. 62 at 20–25, Doc. 64, Doc. 69.

>    *ii. The record demonstrates a rational connection between the facts found and the choices made by the CDC.*

Since the CDC began regulating dog imports in 1956, the CDC has either relaxed or heightened the import requirements based on a dog's country of origin. The 1956 regulations imposed a rabies vaccine requirement on all dogs except those from Australia, Bermuda, Denmark, Ireland, New Zealand, Norway, Sweden, or the United Kingdom of Great Britain and Northern Ireland. 21 Fed. Reg. at 9879, 42 C.F.R. § 71.154(b)(2). Presumably, the CDC concluded that dogs from the excepted countries presented little risk of introducing the disease.[7] The 1985 regulations required a valid rabies vaccination certificate unless the owner certified that the dog had only been in a rabies-free country since birth or for six months before arrival. 50 Fed. Reg. at 1522, 42 C.F.R. § 71.51(c)(i)–(ii). This too derived from a risk assessment about the dog's country of origin. 50 Fed. Reg. at 1522. Between 1956

---

[7] According to an article on the CDC's website, the CDC has conducted surveillance of animal and human rabies since 1961. *See* Gregory L. Parham, *Rabies in the United States, 1981*, CDC, https://www.cdc.gov/mmwr/preview/mmwrhtml/00014696.htm#:~:text=Human%20rabies%20is%20a%20preventable,to%20a%20public%20health%20laboratory (last visited Sept. 3, 2025).

and 2024, the CDC permitted dogs of any age from certain rabies-free countries to enter the United States without proof of rabies immunity.

Today, the CDC designates 126 countries as rabies-free based on "internationally accepted standards." Doc. 60, ¶ 4, ¶ 7; 89 Fed. Reg. at 41739; Doc. 44-6 at 345, 351. According to the CDC, seventy-one percent of the 126 rabies-free countries have dog import requirements that "me[e]t or exceed[] WOAH standards" which the CDC describes as "the best practices" for dog importation. Doc. 44-11 at 19; 89 Fed. Reg. at 41759. An estimated one million dogs seek entry into the United States each year, the vast majority of which come from low-risk or rabies-free countries. 89 Fed. Reg. at 41805; Doc. 60, ¶ 12. The 2024 final rulemaking confirms that the CDC has not observed any rabies infections among dogs imported from rabies-free countries. 89 Fed. Reg. at 41805. The CDC "has confidence" in rabies-free countries that have declared themselves rabies free using WOAH's "self-declared validation process." 89 Fed. Reg. at 41739 (explaining that this resulted in the CDC's "finalizing as proposed the ability of importers of cats and dogs from [rabies]-free and low-risk countries to be admitted through any U.S. port."); Doc. 45 at 22 n.9.

Thus, like the 1956 and 1985 regulations, the CDC's new dog import rule requires no proof of rabies vaccination for a dog from a rabies-free country. Doc. 67

at 1:04:40-1:05:10; Doc. 45 at 24.[8] Rather, dogs from rabies-free countries "may be admitted into the United States . . . if the importer submits written documentation satisfactory to the director that for the six months before arrival, the dog has been only in [] low-risk or [rabies]-free countries." 42 C.F.R. §§ 71.51(f), (g), (u)(1).[9] According to the CDC's website, "[s]tarting on August 1, 2024, the only required documentation for dogs entering or returning to the United States that have been only in dog rabies-free or low-risk countries in the past 6 months is the *CDC Dog Import Form*."[10] The form requires the importer to provide some demographic information about the dog and importer and to click "yes" or "no" in response to the question "Has the dog been in a country that is considered a high-risk country for dog rabies in the last six months?" Thus, the CDC's confidence in rabies-free countries remains high enough that the CDC continues to dispense with the vaccination requirement for rabies-free countries.

---

[8] "For dogs that have *not* been in any of the listed high-risk countries or political units during the past 6 months, CDC strongly recommends vaccination against rabies, but the additional requirements for dogs from high-risk countries to enter the United States do not apply." *See* CDC, HIGH-RISK COUNTRIES FOR DOG RABIES (2024), https://www.cdc.gov/importation/dogs/high-risk-countries.html (last visited Aug. 26, 2025).

[9] Satisfactory documentation as described in the regulation includes (1) a valid certification of foreign rabies vaccination and microchip form, (2) a valid certification of U.S.-issued rabies vaccination form, (3) a valid USDA export certificate, (4) a valid foreign export certificate accompanied by veterinary records, (5) a certification of dog arriving from a rabies-free or low-risk country form accompanied by veterinary records, or (6) other records that the CDC deems satisfactory. 41 C.F.R. § 71.51(u)(2).

[10] CDC, ENTRY REQUIREMENTS FOR DOGS FROM DOG-RABIES FREE OR LOW-RISK COUNTRIES, (2024), https://www.cdc.gov/importation/dogs/rabies-free-low-risk-countries.html (last visited Sept. 4, 2025).

Despite the CDC's continued confidence, the CDC extended the six-month age requirement to rabies-free and low-risk countries "to prevent importers from trying to circumvent CDC's requirements by moving dogs from [rabies] high-risk countries through [rabies]-free or []low-risk countries." 89 Fed. Reg. at 41765–66, 417804. The CDC cites evidence of fraud involving high-risk, low-risk, and rabies-free countries. Doc. 69 at 3–6. The CDC cites four rabid dog imports by animal rescue groups between 2015 and 2021 involving dogs from Egypt and Azerbaijan. Doc. 62 at 5–6. None of these imports involved fraud or suspected fraud in the dog's country of origin; they all involved purported vaccination paperwork fraud. Nonetheless, these imports demonstrate the scale and severity of the problem as well as the risk of harm that fraud in the importation of dogs poses to the United States. *See, e.g.,* Doc. 44-7 at 112–58.

For example, a CDC presentation details the 2015 rabid dog importation, which involved a dog rescued from the streets of Egypt and presented with fraudulent vaccine paperwork. The importer admitted to falsifying the rabid dog's vaccination record and said, "If we had not gotten this dog on the plane to the US, it would have been killed here in Egypt." *Id.* at 120. Such examples demonstrate the forces driving the illegal import of dogs into the United States and the significant public health consequences of importers evading CDC requirements. *See* Doc. 44-7 at 8–9, 14, 112–54. As the record notes, many of the dogs imported by rescue groups are free roaming "street" dogs, which have a greater risk for rabies infection and transmission. Doc. 44-7 at 25. The record contains examples from both the United

States and abroad showing the human and economic toll of rabies importation. *See* 89 Fed. Reg. 41754; Doc. 44-4 at 138–43. The record also documents the growth in demand for puppies from international supply chains. *See* Doc. 44-5 at 204–06; 89 Fed. Reg. at 41759 n.132–n.145; Doc. 44-15 at 568.

The CDC documented a fifty-two percent increase in the number of dogs denied entry to the United States between 2018 and 2020. Doc. 44-5 at 204–07. Most of the dogs came from three high-risk countries and had falsified age and rabies vaccine documentation. *Id.* The CDC's final rulemaking repeatedly mentions documented instances of importers moving dogs under six months old from high-risk countries to low-risk or rabies-free countries to avoid the CDC's entry requirements. 89 Fed. Reg. at 41766, 41784–85, 41798. In a supplemental brief, the CDC identifies suspected cases of importer fraud at the U.S.-Mexico and U.S.-Canada borders involving dogs from high-risk countries. Doc. 69 at 5–6.

A review of the record reveals additional data about border crossings from low-risk or rabies-free countries in which border agents express concern about dogs arriving without proper paperwork, with suspected forged paperwork, and with dubious claims about the dog's country of origin. In one instance, an importer traveled through Mexico and apparently acknowledged that the dog was from Ecuador, a high-risk country, but claimed that his dogs required no import paperwork. *See* Doc. 44-11 at 587. In other instances, border agents strongly suspected that a dog coming from Mexico did not originate in Mexico, but agents lacked sufficient evidence to deny the dog's entry. *See* Doc. 44-11 at 652, 781, 786,

789. In one such case, the paperwork suggested the dogs were three months old, but "the age reported didn't match the appearance of the dogs." *Id.* at 789. The record reveals numerous concerns about missing or fraudulent paperwork for dogs from Mexico. Doc. 44-11 at 388, 478, 509, 528, 555, 684. The record also shows that the CDC denied entry to numerous dogs from Mexico, and many (if not most) were younger than six months old. Doc. 44-11 at 33-279. Finally, the record shows that many dogs imported to the United States from Mexico and Canada were not yet old enough to be effectively vaccinated (i.e., under three months old) before arrival. *Id.* The record also contains several reports detailing both the growth in the demand for young dogs and in the illegal puppy trade. Doc. 44-4 at 364, Doc. 44-5 at 204, Doc. 44-9 at 21; 89 Fed. Reg. at 41755 n.81–n.93.

The CDC identifies no suspected fraud specifically involving the rabies-free Caribbean Islands. Based on this absence of evidence, the plaintiffs assert that the CDC lacked sufficient data to support its expansion of the age requirement to those countries. In other words, the plaintiffs' claim that, as to the rabies-free Caribbean Islands, the CDC is solving a "non-existent problem." Doc. 67 at 4:05-4:52. The plaintiffs rely on *Sustainable Fisheries Coal. v. Raimondo*, 589 F. Supp. 3d 162 (D. Mass. 2022), and *Nat'l Fuel Gas Supply Corp. v. FERC*, 468 F.3d 831 (D.C. Cir. 2006), both of which determined that an agency action was arbitrary and capricious because the agency had no evidence supporting the alleged problem that the action aimed to resolve. *Sustainable Fisheries Coal.*, 589 F. Supp. 3d at 169; *FERC*, 468 F.3d at 841–44.

31

Unlike the agencies in *Sustainable Fisheries Coal.* and *FERC*, the CDC's record contains substantial evidence of an ongoing and increasing problem with fraud involving imported dogs from high-risk countries and dogs routed through rabies-free or low-risk countries. Although none of this evidence directly implicates the rabies-free Caribbean Islands, the plaintiffs identify no controlling precedent suggesting that, even with substantial evidence of an industry problem, the CDC must await the expansion of that problem to each industry participant before imposing tighter restrictions. The CDC has evidence of fraud involving dogs routed through rabies-free and low-risk countries and evidence of fraud involving rabies vaccination. The substantial risk harm posed by importing a rabies-infected dog, "the underlying evidence of vaccination fraud," and "the incentive that would [otherwise] exist to divert dogs from high-risk countries through low-risk or rabies-free countries," support the CDC's decision to impose an across-the-board age requirement "without such specific documentary evidence." *Bruno Project*, 2025 WL 1712912, at *7 (citing *Stilwell v. Off. Of Thrift Supervision*, 569 F.3d 514, 519 (D.C. Cir. 2009)).

Furthermore, *Sustainable Fisheries Coal.* and *FERC* involved distinct statutory authorizations. Here, Congress granted the CDC broad authority to implement necessary inspection measures to prevent the introduction of communicable disease into the United States from foreign countries. The CDC can reasonably decide that relying entirely on another country's rabies vaccination and surveillance regimes is insufficient and that some additional requirement is necessary, particularly given the massive influx of dogs from foreign countries and repeated instances of fraud or

suspected fraud in rabies vaccination. *See* Doc. 44-7 at 112–55. Substantial evidence (1) of fraud in the import of dogs, (2) of many dogs arriving too young to be vaccinated, and (3) of a deadly, communicable disease entering the United States as a result of that fraud is enough to support the CDC's decision and demonstrate a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

The plaintiffs argue that the age requirement is inconsistent with the lack of a vaccine or meaningful rabies inspection requirement. Doc. 67 at 14:42-15:39. The CDC explains that the justification for this distinction is the CDC's confidence in the rabies-free countries' rabies vaccination and surveillance infrastructure. Doc. 67 at 1:04:40-1:06:20. In other words, the new dog import rule imposes a lesser burden on low-risk and rabies-free countries—as it always has—precisely because these countries have public health regimes that successfully reduced or eliminated dog-maintained rabies and that vigilantly seek to avoid re-introduction of that disease through dog imports. Although the CDC's final rulemaking does not describe this analysis with particular clarity, a court must "'uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.'" *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Arkansas-Best Freight Sys.*, 419 U.S. 281, 286 (1974)).

Here, one can reasonably conclude from the record that the CDC perceived enough risk in the import of puppies to require that all dogs entering the United States reach six months of age before entry. The CDC determined that the age requirement would both mitigate the risk of fraud and improve visual inspection by

permitting a more accurate determination of a dog's age and a more accurate visual assessment for disease. Although the record demonstrates that confirming vaccination status through blood titers, etc., is far superior to a visual inspection (which, as the plaintiffs argue, could miss rabies entirely because of the lengthy incubation period), the CDC can rationally decide based on the provenance of a dog to ease the inspection requirements. Indeed, the plaintiffs admit that the confidence in a dog from a rabies-free country, such as a Caribbean Island, should be exceptionally high—high enough to bet your house. Doc. 67 at 32:22-33:00. Therefore, the CDC's imposing only an age requirement and a dog import form is not an arbitrary or capricious inconsistency but a rational and reasonably tailored risk assessment.

At oral argument, counsel for the plaintiffs claimed that the plaintiffs may not have sued if the new rule required all imported dogs—regardless of origin—to have proof of vaccination. Doc. 67 at 14:42-15:39. But because the CDC dispensed with the vaccination requirement for rabies-free countries, the new regulation is "irrationally inconsistent." *Id.* To the contrary, based on the record before me, this would be a much stronger case for the plaintiffs if the CDC had imposed the same requirements on rabies-free countries and high-risk countries. The country of origin clearly matters (and has mattered since 1956). If the CDC completely disregarded the country of origin with nothing more than the evidence in this record, the CDC would have acted in an arbitrary and capricious manner.

The plaintiffs argue that the CDC failed to consider the burden on dog rescue organizations like theirs, and also failed to consider available alternatives, such as a narrower age requirement. Doc. 45 at 18–19, 25. The CDC responds (1) that different age requirements for different countries would incentivize fraud and (2) that the CDC considered the burden by adopting a lower age standard than the WOAH regulations. Doc. 62 at 23–24. The administrative record contains sufficient evidence of a problem with fraud in the import of dogs and the import requirements (as well as consumer demand) driving that fraud. The record shows that the CDC considered adopting WOAH's more stringent standards but instead identified several areas in which the CDC "could reduce the burden on importers while protecting the public health." 89 Fed. Reg. at 41759-60. The CDC also considered differentiating between certain types of importers and allowing a limited exemption for dogs arriving on U.S. land borders. 89 Fed. Reg. at 41760-61, 41766. The CDC determined that these distinctions would prove less useful in evaluating the risk of rabies, more difficult to reliably confirm, and fraught with potential for fraud based on the CDC's recent experience. 89 Fed. Reg. at 41760–61. As explained in *Fox Television*, because "the new policy is permissible under the statute, . . . there are good reasons for it, and . . . the agency *believes* it to be better," the record supports the CDC's change in policy for rabies-free and low-risk countries. 556 U.S. at 515.

Finally, the CDC justifies the new regulation based on instances of importer fraud involving the reason for the import. 89 Fed. Reg. at 41727; Doc. 62 at 9. According to the CDC, the United States Department of Agriculture ("USDA")

already imposes a six-month age requirement on dogs imported for resale. Doc. 62 at 9; 9 C.F.R. § 2.150-.153. The record contains evidence of importers misrepresenting dogs as not for re-sale to avoid the USDA's age requirement. Doc. 69 at 6–9. The CDC ties this to rabies risk by explaining that such importers are often unfamiliar with the dog's health history, as seen in the case of a dog imported from Egypt in 2017. 89 Fed. Reg. at 41727, 41760; Doc. 44-5 at 86–89. Although animal welfare is outside the CDC's purview as delineated by Congress in Section 264(a),[11] instances of importers engaging in fraud to avoid a USDA six-month age requirement—which led to the import of a rabid dog—lend further support for the conclusion that CDC's imposition of an age requirement on rabies-free and low-risk countries is not arbitrary and capricious.

## V.    CONCLUSION

Accordingly, based on my finding that the age requirement in 42 C.F.R. § 71.51 is both within the CDC's statutory authority in 42 U.S.C. § 264(a) and not arbitrary and capricious as applied to the rabies-free Caribbean Islands, the plaintiffs' motion for summary judgment, Doc. 45, is **DENIED**, and the defendants' cross-motion for summary judgment, Doc. 61, is **GRANTED**. The Clerk is directed to

---

[11] At oral argument and in supplemental briefing, the CDC argues that the age requirement assures the general health and well-being of dogs during travel. Doc. 67 at 1:15:20–1:17:25; Doc. 69 at 11, Ex. 3. This may be true, but this was not the stated purpose of CDC's revising the dog import regulation (i.e., "to prevent the reintroduction and spread of dog-maintained rabies virus variant"). 89 Fed. Reg. at 41726.

enter a judgment against the plaintiffs and in favor of the defendants, to terminate any pending motion, and to close the case.

**ORDERED** in Tampa, Florida, on this 30th day of September, 2025.

LINDSAY S. GRIFFIN
United States Magistrate Judge